The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**

**Filing Date:** September 25, 2023

**NO. S-1-SC-39139**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

      Petitioner-Respondent/Cross-Petitioner,

v.

**DOUGLAS B.,**

      Respondent-Petitioner/Cross-Respondent,

and

**SARA E.,**

      Respondent-Cross Respondent/Cross-Petitioner.

**IN THE MATTER OF ABIGAIL B.,**

      Child.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Allen R. Smith, District Judge**

Mary McQueeney, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Petitioner-Respondent/Cross-Petitioner

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Respondent-Petitioner/Cross-Respondent


Susan C. Baker
El Prado, NM

for Respondent-Cross Respondent/Cross-Petitioner

**OPINION**

**THOMSON, Justice.**

{1}      The Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, places procedural safeguards on removal of Indian children from Indian families. *See* 25 U.S.C. §§ 1902, 1911. One such safeguard is a requirement that a Qualified Expert Witness (QEW) testify and that the QEW be qualified to provide certain categories of testimony. 25 U.S.C. § 1912(e). These categories generally cover two areas: (1) the likelihood of continued custody by the parent or Indian custodian resulting in serious emotional or physical damage to the child (serious damage) and (2) the prevailing social and cultural standards of the Indian child's tribe (cultural standards). 25 C.F.R. § 23.122(a) (2023).[1] This opinion clarifies whether the two categories of QEW testimony are analyzed independently or jointly and what expertise is required. Next, we examine the particular qualifications of the QEW in this case. Finally, we determine the proper remedy in this case—remand or dismissal.

---

[1] The *Code of Federal Regulations* is updated annually. For ease of reference, this opinion cites the current edition of the regulations as there has been no substantive change to the regulations cited in this opinion since 2016.

{2}    We affirm the Court of Appeals, concluding first that courts must independently analyze qualification in the two categories of required QEW testimony under ICWA and that the testimony can come from one or multiple experts. Second, our evidentiary rules governing expert testimony are sufficient to guide a court tasked with qualifying a QEW. Applying that standard, we hold that the QEW in this case was qualified to testify as to the cultural standards of the tribe. However, the same QEW was not qualified to testify regarding serious damage to the child. Finally, we hold that remand for a new adjudicatory hearing is the appropriate remedy in this case.

## I.    BACKGROUND

{3}    In October 2018, the Children, Youth, and Families Department (CYFD) received a referral after a young girl (Child) revealed to a source that she was self-harming and wanted to kill herself. Child also reported that her parents, Douglas B. (Father) and Sara E. (Mother) (collectively, Parents), fought constantly, that they were violent toward one another, and that Father was an alcoholic. Family members expressed concern about "severe domestic violence" and about Parents abusing alcohol and methamphetamine. CYFD took custody of Child and placed her with her paternal aunt.

{4} Although Parents initially refused to provide information about Child's ancestry, CYFD discovered that Child was eligible for membership through Mother in the Wichita and Affiliated Tribes of Oklahoma (Child's Tribe), and Child's Tribe intervened in the case. After placing Child with her aunt, the district court held a series of adjudicatory hearings to determine whether Child was abused or neglected and whether to keep Child in CYFD custody under her aunt's care.

{5} Kyli Ahtone was proffered by CYFD to testify as a QEW in one of the adjudicatory hearings.[2] Ms. Ahtone testified that she holds a bachelor's degree in Criminal Justice and was raised as a member of the Apache Tribe of Oklahoma on her tribe's reservation. Child's Tribe had employed Ms. Ahtone for the last five years as an ICWA caseworker, and her job was to monitor state cases involving children from Child's Tribe to ensure ICWA compliance. Ms. Ahtone handled many ICWA cases throughout her five years working for Child's Tribe, but she was unable to provide an exact number. She was qualified as an ICWA expert more than fifty times in Oklahoma and other states, but she did not recall whether she had "ever qualified as an expert in New Mexico before." She regularly attended Child's Tribe's

---

[2]It is not clear from the record whether CYFD proffered Ms. Ahtone as its QEW or simply as a witness who is an expert on ICWA. We analyze Ms. Ahtone's qualifications assuming she was proffered as a QEW and suggest that CYFD clarify this issue on remand to the district court.

ceremonies, events, and rituals and informed the district court that while her tribe's cultural norms and those of Child's Tribe were "very similar," there were a few ways in which they differed.

{6} CYFD proffered Ms. Ahtone as a QEW on this foundation without specifying the category of testimony for which she was proffered. Father objected, arguing that Ms. Ahtone was not properly qualified as a QEW because she was not a member of Child's Tribe. CYFD responded that while the QEW could be a member of Child's Tribe, a QEW could also be a person not from Child's Tribe, but one who "ha[s] substantial experience in the delivery of child and family services to Indian people." This experience, CYFD argued, could include "knowledge of prevailing social and cultural standards as well as childrearing practices of the Child's Tribe or Indian cultures."

{7} Before it qualified Ms. Ahtone as an expert, the district court allowed CYFD to lay additional foundation. Ms. Ahtone repeated that she had attended numerous ICWA trainings. She provided more specifics to her previous testimony, adding for example that she met quarterly with the foster care review board, and noted that when she had any questions regarding Child's Tribe's culture, she referred to the board. She also stated that she raises her own children in her tribe's culture and "raise[s] them as [she was] raised to follow [tribal] traditions."

4

{8} CYFD then turned to questions regarding Ms. Ahtone's understanding of the familial and cultural expectations of Child's Tribe. Ms. Ahtone appeared confused by these questions. When asked about expectations for family organization and operation, she stated, "we live as a regular family, the only thing different about us is that, for us, we believe in different things." CYFD attempted to rephrase and asked what duties family members owed to each other and about cultural views concerning arguing and disagreement. Ms. Ahtone answered that she "would probably have to go off of [her] own family" and that these sorts of issues had not come up at the foster review board meetings. She disclosed, "For [Child's Tribe], I've never really been asked that question. I've usually just gone on [whether] I've known [Child's Tribe's] customs."

{9} CYFD then moved on to question Ms. Ahtone about her understanding of her own tribe's expectations around the use of alcohol and drugs. She responded, "growing up we did not have this type of situation within our family . . . , but . . . I had witnessed this within [other] families" and added, "usually our families would handle these situations [for] ourselves," and "our parents gave up their children to grandparents for grandparents to raise the children."

{10} The district court asked Ms. Ahtone whether she had anything in writing from Child's Tribe that certified her as an expert in ICWA related matters. Ms. Ahtone

stated that she was not sure and would have to look through her records. If Child's Tribe had not certified her as an expert, she believed there were members of Child's Tribe on the foster care review board who could testify instead. The record does not show that the district court ever received clarification on this issue, but the court ultimately qualified Ms. Ahtone as a QEW over Parents' objections. The district court's decision relied in part on her previous involvement in this case, her experience testifying as an ICWA expert in the past, and the court's finding that she was designated by Child's Tribe as an ICWA expert. The district court did not clearly distinguish her qualifications to testify about each of the two categories of QEW testimony required by ICWA.

{11} In a written judgment, the district court held that the return of Child to Parents was likely to result in serious harm to Child and was not in Child's best interest. It noted that "[a]ctive efforts ha[d] been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and [that] such efforts ha[d] been unsuccessful," and it ordered continued custody by CYFD. The judgment did not mention the cultural standards testimony required of a QEW under ICWA nor did it provide a reason why cultural standards testimony may not be required in this instance. Parents each appealed.

{12}     In a consolidated opinion, the Court of Appeals reversed. *State ex rel. CYFD v. Douglas B.*, 2022-NMCA-028, ¶¶ 1-2, 511 P.3d 357. It held that serious damage to the child and cultural standards of the Indian child's tribe are subjects requiring QEW testimony and that qualifications of an expert on these subjects must be analyzed independently. *Id.* ¶¶ 17-18. It affirmed the district court's qualification of Ms. Ahtone as an expert on cultural standards. *Id.* ¶ 29. However, it concluded that the district court abused its discretion in qualifying Ms. Ahtone as an expert on serious damage to the child. *Id.* ¶ 35. In the absence of reliable testimony by a QEW, the Court of Appeals reversed the district court's abuse and neglect adjudication. *Id.* ¶ 35. The Court of Appeals remanded the case to the district court for proceedings applying its interpretation of the QEW requirements under *State ex rel. CYFD v. Marlene C.* (*In re Esther V.*), 2011-NMSC-005, 149 N.M. 315, 248 P.3d 863. *Douglas B.*, 2022-NMCA-028, ¶ 37. Father filed a petition for certiorari while Mother and CYFD filed separate cross-petitions, all of which this Court granted.

**II.     DISCUSSION**

**A.     Standard of Review**

{13}     Interpretation of ICWA and its relationship to New Mexico law presents a question of law that we review de novo. *Esther V.*, 2011-NMSC-005, ¶ 14. "Our overarching goal when interpreting ICWA is to effectuate Congress's intent." *Id.* ¶

7

15. In discerning legislative intent, "we look first to the plain language of the statute, giving the words their ordinary meaning." *Flores v. Herrera*, 2016-NMSC-033, ¶ 8, 384 P.3d 1070 (internal quotation marks and citation omitted). "The text of ICWA is the primary indicator of congressional intent, and to the extent that the language of the statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Esther V.*, 2011-NMSC-005, ¶ 15 (internal quotation marks and citation omitted).

**B.     The Two Categories of QEW Testimony Required by ICWA**

{14}     ICWA was designed in part to respond to the fact that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 U.S.C. § 1901(4). "States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5). In recognition of these issues, ICWA imposes procedural safeguards for removal of an Indian child from an Indian family, including a statutory requirement for QEW testimony:

> No foster care placement may be ordered in such proceeding in the
> absence of a determination, supported by clear and convincing

evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e). In promulgating regulations to implement Section 1912(e), the Bureau of Indian Affairs (BIA) offered insight into the considerations behind the two testimony requirements by stating, "In passing ICWA, Congress wanted to make sure that Indian child-welfare determinations are not based on a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family." Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38777, 38829 (Dec. 12, 2016) (codified at 25 C.F.R. pt. 23) (alteration in original) (internal quotation marks and citation omitted).

{15} The BIA regulations (Regulations) link the two categories of testimony by noting that the question whether continued custody by a parent or Indian custodian "is likely to result in serious emotional or physical damage to the child is one that should be examined in the context of the prevailing cultural and social standards of the Indian child's Tribe." *Id.* There are, however, "certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard." *Id.* at 38829-30. Ultimately, "the [Regulations] still provide[] State courts

with discretion to determine what qualifications are necessary in any particular case." *Id*. at 38830.

{16} CYFD argues that, in general, the cultural standards category of testimony should be considered jointly with the serious damage category because the plain language of federal regulations promulgated to implement § 1912(e) provides that the serious damage component should be considered in light of the Indian child's tribe's cultural standards. CYFD suggests that the Regulations do not explicitly provide for separately weighing the cultural standards requirement and the serious damage requirement. In contrast, Parents highlight the plain language of the Regulations and argue that the two qualification categories are separate and, as a result, whether a particular expert is qualified to testify as to each type of testimony is determined independently.

{17} On this question, the Court of Appeals concluded that the "definition promulgated by the BIA . . . splits the ICWA expert [testimony] requirement into two separate components." *Douglas B.*, 2022-NMCA-028, ¶ 17. While CYFD is correct that the plain language of the statute does not include a strict requirement that one expert be qualified to testify about both cultural standards and serious damage to the child, the Regulations highlight and consistently reference the importance of providing testimony about the cultural standards of the tribe. *See* 81

Fed. Reg. 38779 ("State agencies and courts had often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."); *id.* at 38780 (noting that one of the four leading factors contributing to high rates of Indian child removal was "a lack of culturally competent State child-welfare standards for assessing the fitness of Indian families"); *id.* at 38784 ("ICWA helps ensure that State courts incorporate Indian social and cultural standards into decision-making that affects Indian children."); *id.* at 38829 ("[E]xpert testimony presented to State courts should reflect and be informed by those cultural and social standards."). Although the BIA regards cultural testimony as important, it clarified that if there are multiple experts in the case, they may each be qualified separately to testify about either cultural standards or serious damage; one, however, must testify about serious damage. *See id.* at 38831 ("The court may accept expert testimony from any number of witnesses, including from multiple qualified expert witnesses . . . [where] at least one qualified expert witness *must* address the issue of whether continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child . . . and that the qualified expert witnesses should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." (emphasis added)).

{18} Ultimately, the BIA left the determination of whether testimony about cultural standards is necessary in a particular case to the discretion of the court and noted that cultural testimony is not necessary where it is "plainly irrelevant to the particular circumstances at issue in the proceeding." *Id*. at 38830. For example, it referenced situations where a child is a victim of sexual abuse, explaining that "a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify as a qualified expert witness regarding whether return of a child to a parent who has a history of sexually abusing the child is likely to result in serious emotional or physical damage to the child." *Id.* In this situation, and other very limited similar situations, cultural standards testimony is not strictly required in order to determine that the abuse caused serious damage to the child. *See id*. This does not mean, however, that even in these limited situations, a court is released from its obligation to qualify a QEW—whether one or several—separately on the two categories identified in the Regulations. We apply this separate approach to the qualification of the expert in this case.

**C.     Standard for Qualification of a § 1912(e) Expert**

{19} As in other areas of expert testimony, the standard for qualification of a QEW exists in our rules of evidence, which provide,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise

> if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Rule 11-702 NMRA. There are three requirements for experts to be qualified under Rule 11-702. *State v. Alberico*, 1993-NMSC-047, ¶¶ 43-45, 116 N.M. 156, 861 P.2d 192. They must (1) be qualified "by knowledge, skill, experience, training, or education," (2) present an opinion based on their "scientific, technical, or other specialized knowledge," and (3) be helpful to the trier of fact in understanding the evidence or determining a fact at issue. *Id.* (internal quotation marks and citation omitted). Our evidentiary rules combined with the standard announced in *Alberico* provide sufficient guidance to our courts to qualify a QEW in an ICWA proceeding.

**1.      Category 1: serious damage**

{20}    "For a foster-care placement . . . , the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the . . . child." 25 C.F.R. § 23.121(c) (2023). The QEW's role is to assist the trier of fact with the causation element of the serious damage requirement. The BIA implementation guidelines further explain that an expert witness who is qualified to draw this causal connection must have "'expertise beyond normal social worker qualifications.'" U.S. Dep't of the Interior, BIA, Guidelines for Implementing the

Indian Child Welfare Act, 53-54 (quoting H.R. Rep. No. 95-1386, at 22 (1978)). Various justifications for this standard include the concern that many social workers who lack understanding of Indian cultural values and social norms make decisions without proper context and "frequently discover neglect or abandonment where none exists." H.R. Rep. 95-1386, at 10. We construe this guidance along with the plain meaning of 25 U.S.C. § 1912(e),[3] to require that a court not accept an expert based simply on a social work degree but must require expertise beyond the normal social worker qualification. *See* 81 Fed. Reg. 38780 (reporting that "'social workers, ignorant of Indian cultural values and social norms, ma[d]e decisions that [we]re wholly inappropriate in the context of Indian family life and so they frequently discovere[d] neglect or abandonment where none exist[ed]'") (alterations in original) (quoting H.R. Rep. 95-1386, at 10); *see, e.g.*, *I.P. v. Wisconsin* (*In re Interest of D.S.P.*), 480 N.W.2d 234, 240 (1992) (affirming as a QEW, a testifying social worker who was a member of the petitioner's tribe, who "was reared in the tribal tradition," who "has reared eight children in the tribal tradition," and who was "one of the drafters of the ICWA at the federal level").

---

[3]Although this case involves an adjudicatory hearing, our holding also applies to termination hearings under 25 U.S.C. § 1912(f).

{21} This does not mean, however, that someone like Ms. Ahtone who has other education, including significant ICWA training, could not be qualified as a QEW due to absence of a social work degree. "[T]he proper initial inquiry for the admissibility of expert opinion testimony, or any evidence for that matter, is the purpose for which it is being offered." *Alberico*, 1993-NMSC-047, ¶ 71. A court's inquiry into whether an expert is qualified to give an opinion is guided by that expert's qualification to assist a trier of fact to understand the causal connections described in ICWA regulations, 25 C.F.R. § 23.121(c). This is why a "trial judge has wide discretion to determine whether a witness is qualified to give testimony as an expert, and no set criteria can be laid down to test [such] qualifications." *State v. Sloan*, 2019-NMSC-019, ¶ 42, 453 P.3d 401 (alteration in original) (internal quotation marks and citation omitted). "Appellate courts review the qualification of an expert for an abuse of discretion." *Id.* We turn now to whether Ms. Ahtone was qualified to testify as a QEW.

{22} At the time of the hearing, Ms. Ahtone worked for Child's Tribe as an ICWA caseworker, and she stated that her job was to monitor state cases involving children from Child's Tribe to ensure compliance with ICWA. She testified about her education and experience working with ICWA cases and her attendance at multiple ICWA trainings. In this case, Child was allegedly exposed to substance abuse and

domestic violence, and she was allegedly engaging in self-harm and experiencing suicidal ideation. None of Ms. Ahtone's testimony demonstrated that she had expertise, or even experience, in these areas. CYFD never asked Ms. Ahtone to explain the subject matter of her previous expert testimony, whether her ICWA training covered the topics presented, or whether she had been taught how to determine whether certain types of abuse were likely to manifest self-harm or suicidal thoughts. In other words, CYFD did not link Ms. Ahtone's training, education, or experience to the required "causal relationship between the particular conditions in the home and the likelihood that continued custody of [C]hild will result in serious emotional or physical damage to [Child]." 25 C.F.R. § 23.121(c).

{23}   We therefore agree with the Court of Appeals that CYFD did not lay the proper foundation required by Rule 11-702 to qualify Ms. Ahtone to testify about serious damage to Child, *Douglas B.*, 2022-NMCA-028, ¶ 30, and we hold that the district court abused its discretion in allowing Ms. Ahtone to testify on this subject.

**2.    Category 2: cultural standards**

{24}   With regard to the cultural standards testimony, the BIA procedural guidelines provide that a "a qualified expert witness should have specific knowledge of the Indian tribe's culture and customs" and then set out a list of persons who, "in descending order [based on various levels of experience and knowledge], are

16

presumed to meet the requirements for a qualified expert witness," including a "member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on [that witness's] knowledge of the delivery of child and family services to Indians and the Indian child's tribe." Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146, 10157 § D.4 (Feb. 25, 2015). Experts who meet one of those requirements are presumably qualified as QEWs. *Id.*

{25}    In considering the BIA procedural guidelines' approach, to the extent that the witness was designated by Child's Tribe as its ICWA expert, that witness would be "presumed to meet the requirements" for testifying as a QEW about Child's Tribe's cultural standards. *Id.* The district court found that Ms. Ahtone was designated by the Tribe as its ICWA expert. This finding is supported by substantial evidence in the record, including Ms. Ahtone's statement to the district court that she was designated by the Tribe, her five years of employment by the Tribe, and the notice she sent that Child "is . . . eligible for membership in the [Tribe]" and that the Tribe "intend[ed] to intervene" in the case, which was on the Tribe's letterhead. Therefore, Ms. Ahtone was qualified as a QEW to testify about the cultural standards of the Tribe. *See* 80 Fed. Reg. 10157 § D.4.

{26}    While we affirm the Court of Appeals on this category of testimony based on Ms. Ahtone's designation by Child's Tribe, we emphasize that knowledge about a tribe's spiritual customs and ceremonial events is not necessarily sufficient to qualify an expert to testify about the tribe's societal and cultural attitudes surrounding familial relationships. The BIA procedural guidelines emphasize consideration of the tribe's cultural standards regarding raising children. *See id.* If a witness is not presumably qualified by having been designated by the tribe, the BIA procedural guidelines go on to list two options for persons to become presumably qualified to meet the requirements of a QEW, both of which require the person to have "knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe." *Id.* § D.4 (b)(3), (4). Parties should take care to lay sufficient foundation to meet these requirements.

**D.    The Proper Remedy Is to Remand to the District Court for Further Proceedings**

{27}    Having determined that Ms. Ahtone was not qualified to testify as a QEW, we clarify the remedy. "Ordinarily, appellate reversal on substantive grounds of an adjudication of abuse or neglect results in the dismissal of the petition and a remand to the district court, which retains jurisdiction to determine whether the parent prevailing on appeal should regain custody of the child." *Esther V.*, 2011-NMSC-005, ¶ 48 (internal quotation marks and citation omitted). However, in *Esther V.*, this

Court remanded a similar case instead of dismissing because (1) the case decided an issue of first impression, (2) CYFD "made a good faith effort to comply with the letter and spirit of ICWA," and (3) "requiring CYFD to begin the process anew . . . by bringing new allegations of abuse or neglect neither promotes judicial economy nor protects [the child's] best interests." *Id.* ¶ 49. Parents argue that this case should be dismissed under *State ex rel. CYFD v. Benjamin O*, 2007-NMCA-070, 141 N.M. 692, 160 P.3d 601, while CYFD argues that this case should be remanded because, as in *Esther V.*, it is an issue of first impression that clarifies a procedural issue. Parents respond that Ms. Ahtone's nonqualification as a QEW is not procedural but substantive because it constitutes a failure by CYFD to prove an element in its prima facie case and therefore that the case should be dismissed.

{28}     In this case, as a procedural matter and a matter of first impression, we clarify that ICWA sets forth two distinct testimony requirements for QEWs, and we reverse the neglect and abuse adjudications upon a determination that the record did not support the district court's qualification of Ms. Ahtone to testify as an expert regarding serious damage to the Child. CYFD acted in good faith to comply with ICWA, its error being conflation of the cultural standards testimony requirements with the serious damage to the child requirements. If we were to order dismissal of the abuse and neglect petition, "CYFD would be precluded from bringing the same

potentially meritorious allegations in a new petition but instead would have to decide whether it had grounds to supplement the original petition or file a new petition with different allegations of abuse or neglect." *Esther V.*, 2011-NMSC-005, ¶ 49. Remand is in the interest of judicial economy because there is a possibility that Ms. Ahtone could qualify to testify as a QEW if the proper foundation is laid under this Court's guidance. We conclude, as this Court did in *Esther V.*, "that requiring CYFD to begin the process anew in this case by bringing new allegations of abuse [and] neglect neither promotes judicial economy nor protects Child's best interests." *Id.* We therefore affirm the Court of Appeals and remand this case to the district court for a new adjudicatory hearing.

## III.   CONCLUSION

{29}   We affirm the Court of Appeals' conclusions that the two testimony requirements for QEWs under ICWA are separate and that Rule 11-702 supplies the proper standard for qualification. We affirm the Court of Appeals' holding that Ms. Ahtone is not qualified to testify as to serious damage to Child. We also affirm the Court of Appeals' holding that Ms. Ahtone was qualified to testify as to the cultural standards of Child's Tribe. Finally, we remand to the district court for a new adjudicatory hearing.

{30}   **IT IS SO ORDERED.**

_____

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

_____

**C. SHANNON BACON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**JULIE J. VARGAS, Justice**

_____

**BRIANA H. ZAMORA, Justice**